■ In the Matter of George De Sipio et al., as Committee of the Property of Herman Younker, an Incompetent Person. Janet Y. Willen, Appellant, v George De Sipio et al., as Committee of the Property of Herman Younker, an Incompetent Person, Respondents. — Order, Supreme Court, New York County (A. P. Williams, J.), entered December 1, 1981 confirming the report of a referee and authorizing the payment of certain sums by the committee of the property of Herman Younker, is modified, on the law and the facts, to the extent of disapproving so much of the report as authorizes the payment of $4,000 to Joan B. Levee for room and board for the incompetent for the months of July and August, 1980, and as authorizes payments of $266 to Alice Dunn Levee, and $267 to each of Ellen Levee and J. B. Levee for acting as companions for the incompetent for the months of July and August, 1980, and so much of the order as authorizes such payments is stricken, and the order is otherwise affirmed, without costs. Raymond F. Levee, a psychologist, is a cocommittee of the person and property of the incompetent, and apparently he and his family have a close relationship to the incompetent, and formerly to the incompetent's now-deceased mother. Until July 1, 1980, the incompetent's mother and her lawyer Mr. De Sipio were cocommittees of the property of the incompetent, and Dr. Levee and the mother were cocommittees of the person. On July 1, 1980, the mother resigned both these cocommitteeships and Mr. De Sipio was appointed cocommittee of the person and Dr. Levee cocommittee of the property, so that now Mr. De Sipio and Dr. Levee are cocommittees of both the property and the person. Pursuant to the order of July 1, 1980 appointing Dr. Levee as cocommittee of the property, Dr. Levee receives as an annual fee for his companionship of the incompetent $7,600 ($800 per month for July and August, $600 per month for the rest of the year). Dr. Levee has waived any compensation for his duties as cocommittee of the *property*. In the summers of 1979 and 1980, the incompetent spent the months of July and August in Dr. Levee's home in Connecticut. In the present application, the committee of the

property sought and was granted authorization, among other things, to pay to Dr. Levee's wife, Joan B. Levee, the sum of $4,000 for room and board for the incompetent at the rate of $500 per week, and compensation to Dr. Levee's three daughters for acting as companions to the incompetent in Dr. Levee's home during July and August, 1980 at the aggregate purported rate of $100 per week (really $400 per month) to be shared equally among the three daughters. We cannot approve these payments to the immediate family — the wife and daughters — of a cocommittee, where the incurring of such expense was not approved in advance by a court, there is no showing of the amount of expense incurred by the cocommittee or his family on behalf of the incompetent, and it appears that the companionship was by the cocommittee's family in their own home by his daughters who were not otherwise employed. Nor does it appear that the cocommittee's home was being used for paying guests or that the incompetent was occupying a room that a paying guest would have otherwise occupied. On the contrary, the incompetent was treated simply as a guest, and indeed a member of the family, in the cocommittee's home. We do not question that the companionship and solicitude for the incompetent and his guest status were all to the incompetent's benefit. But whatever may be the motivation in the present case, public policy requires that fiduciaries not be tempted to incur obligations to themselves and their families at the expense of their wards without a showing either of court approval in advance or actual out-of-pocket expenditure. Otherwise, we have a situation that smacks too much of an unseemly conflict of interest on the part of the fiduciary. We do not think this result is altered by the fact that the incompetent's mother approved at least room and board for the summers of 1979 and 1980, and perhaps compensation to the cocommittee's daughters for companionship for the summer of 1980. Apart from any other consideration, it appears that the mother herself was the subject of a conservatorship from the summer of 1979 until her death. The situation is different as to the other items allowed — reimbursement of out-of-pocket expenditures and petty cash to Dr. Levee's wife, Joan Levee, and to Dr. Levee himself. Furthermore, for the month of June, 1980, Alice Dunn Levee was hired on an emergency basis as part-time companion to the incompetent when the then paid companion resigned and she made trips to New York City from her home in Connecticut to spend time with the incompetent. The allowance to her for her services in June, 1980 was proper, as was reimbursement of the out-of-pocket expenditures and petty cash to Dr. Levee and his wife. Concur — Carro, Silverman and Asch, JJ.

Kupferman, J. P., dissents in part and concurs in part in a memorandum as follows: The report of the special referee, which was confirmed by the Judge at Special Term, states as follows: "The incompetent went on vacations with the Levees, and in the years prior to her death, the incompetent's mother rented a house each summer near the Levee's and her son spent a good part of his day with them. In the summer of 1979, the pattern was changed due to the mother's physical condition. Instead of renting a house, she proposed that her son stay with the Levee's at the rate of $500 a week, plus extra compensation for the Levee daughters who would take turns in giving him both necessary supervision and companionship. George DeSipio, then co-committee of the property, and currently co-committee of the person and property, testified that he concluded the arrangement was reasonable considering the alternative of renting a house and staffing it. The 1980 arrangement was substantially similar to what was proposed and found reasonable in 1979. It was established that the incompetent stayed with the Levees for eight weeks. It is an extremely ample home which appears to provide the incompetent with physical comfort, emotional support, a pond for swimming, outlets for the incompetent's musical

interests, etc. It is reported that the amount sought for such accommodations is reasonable. Insofar as companionship fees are concerned, since it is established in this case that the incompetent needs supervision, and since the summer 1980 practice appears to duplicate the prior year's practice devised by the incompetent's mother, it is reported that the $100 weekly amount incurred was necessary and reasonable." While I can concur with the majority on the basis that Dr. Levee now being a cocommittee for the incompetent should not be reimbursed for the service he performed, although worthwhile, I cannot agree that the payments to the three daughters at a total of $400 per month should be eliminated. The incompetent had a brain injury, suffered from birth. He needs companionship and can lead an active life if he has it. It is not easy to find competent and compassionate assistants. In view of the substantial property of the incompetent, the amount involved is picayune as compared to the service rendered. To eliminate these payments simply because of a presumed nepotism is to do a disservice to the ward.